STARK COUNTY BAR ASSOCIATION *v.* ARKOW.

[Cite as *Stark Cty. Bar Assn. v. Arkow,* 104
Ohio St.3d 265, 2004-Ohio-6512.]

(No. 2004–1008—Submitted August 17, 2004—Decided December 15, 2004.)

**Per Curiam.**

{¶ 1} Respondent, Seth W. Arkow of Canton, Ohio, Attorney Registration No. 0069103, was admitted to the practice of law in Ohio in 1998. On October 6, 2003, relator, Stark County Bar Association, charged respondent with three counts of professional misconduct. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and, based on the parties' stipulations, testimony, and exhibits, made findings of fact, conclusions of law, and a recommendation, all of which the board adopted.

Count One

{¶ 2} Respondent has a private law practice with a concentration in family law. He practices mainly in Stark County but also has an office in Tuscarawas County. In May 2001, respondent and another Stark County lawyer with whom he had formerly shared office space entered into a partnership agreement.

{¶ 3} Before and after this agreement, respondent's partner represented Kathy S. Fowler (n.k.a. Simons) in a domestic-relations case pending in the Stark County Court of Common Pleas. According to a June 2000 entry of dissolution filed in the Fowler case, the parties were to retain an expert to prepare a qualified-domestic-relations order ("QDRO") that divided the pension benefits accrued by Fowler's ex-husband.

{¶ 4} In February 2001, respondent's partner asked for a $150 check, which he eventually received, from Fowler's ex-husband to pay half of the anticipated cost for retaining a consultant to prepare the QDRO. At about the same time, Fowler remitted a $150 check, representing her share of the consultant's fee. Before the

arrangements to complete the QDRO could be made, however, respondent's partner quit the partnership and moved away.

{¶ 5} Although their written partnership agreement did not specify that respondent would assume Fowler's representation after the partner's departure, they orally agreed to this. Thus, when Fowler filed a grievance with relator in September 2001, complaining that no one had finished arrangements for the QDRO, relator inquired of respondent as to the reason. In reply, respondent promised to complete the QDRO.

{¶ 6} To this end, Fowler gave respondent a new check for $150 made payable to the QDRO consultant. Respondent also had a check issued on a partnership account to pay the husband's $150 share of the consultant fee. Respondent submitted these two checks, along with a letter and application, on December 10, 2001, to QDRO Consultants.

{¶ 7} In January 2002, respondent represented to relator's investigator that he had resolved the QDRO situation for Fowler and had "put the matter to rest." Respondent later learned, however, that the consultant had wanted $350 to prepare the QDRO, $50 more than respondent had paid. Then, in the spring of 2002, one of respondent's employees told the consultant to stop work on the Fowler case. The consultant did and returned the $300 previously paid to his company. Respondent deposited the $300 in his IOLTA account.

{¶ 8} Respondent did not promptly advise Fowler or relator that the QDRO project had stalled, and in August 2002, the investigator contacted respondent to inquire again about the status of the QDRO. On January 2, 2003, respondent sent a letter to the investigator stating, "I have forwarded the sum of $350 to QDRO Consultants, and they are preparing the necessary documents." In reality, however, respondent never did pay this sum or rehire the consulting company.

{¶ 9} On January 28, 2003, relator's investigator asked respondent why he had not paid the QDRO consultants $350 as represented. Respondent did not respond to the investigator's letter, nor did he ever complete the Fowler QDRO. In March 2004, however, respondent refunded the $300 owed to Fowler and her ex-husband by mailing trust-account checks to relator.

{¶ 10} The parties stipulated and the board found that respondent had violated DR 6–101(A)(3) (a lawyer shall not neglect an entrusted legal matter) and Gov.Bar R. V(4)(G) (a lawyer shall not neglect or refuse to assist in an investigation) in connection with Count One. The board also found a violation of DR 7–101(A)(2) (a lawyer shall not intentionally fail to carry out a contract of employment).

## Count Two

{¶ 11} In March 2002, attorney Derek Lowry filed a complaint in the Stark County Juvenile Court on behalf of a father seeking custody of his minor son. On March 11, 2002, the court granted temporary custody of the child to his father. At a hearing on April 23, 2002, the child's mother appeared, and the court appointed attorney Douglas Bond to represent her. At a July 2002 pretrial conference, Lowry and Bond, appearing without their clients, advised the court that the parties were living together and that an agreed entry as to their child's custody would be submitted within 30 days.

{¶ 12} Thereafter, the counsel for the parties failed to timely file the agreed entry. As a result, counsel assumed that the case would be dismissed in accordance with the usual practice of the juvenile court. The custody case, however, was not dismissed.

{¶ 13} In early January 2003, the child's paternal grandparents retained respondent to obtain visitation rights for them and an order granting permanent custody to them or their son. After reviewing the court file in the case, respondent learned that the juvenile case remained open although the agreed entry had not been filed. Concerned that the custody case might be dismissed because of the failure to file the agreed entry and the passage of time, respondent prepared a draft order for submission to the court that granted custody of the child to his father, joined the paternal grandparents as parties to the action, and granted visitation rights to the grandparents.

{¶ 14} On January 9, 2003, respondent attempted to advise Bond, the mother's attorney, that he intended to present the proposed order to the court the following day. Respondent was unable to reach Bond so he placed in Bond's mailbox at the court the proposed order and a letter indicating that respondent planned to seek the judge's approval on "Friday, January 20, 2003" at 10:00 a.m. Respondent's letter misstated the next day's date, which was actually January 10, 2003.

{¶ 15} On the morning of January 10, 2003, Lowry saw Bond in the Stark County courthouse and told Bond that he and respondent were going to meet with the judge concerning the proposed order at 10:00 a.m. Bond, who had not yet seen either the letter or the proposed order, had been unaware of the planned meeting and did not appear. The judge signed the order that morning in Lowry's and respondent's presence.

{¶ 16} Bond later filed a motion to vacate the order because neither he nor his client had agreed to it. Ultimately, the parties signed and filed another judgment entry that contained terms agreeable to the parents and that removed the paternal grandparents as parties. Until that time, the child had remained in his mother's custody despite the order that respondent had prepared.

{¶ 17} The parties stipulated and the board found that respondent had violated DR 7-110(B) (a lawyer shall not communicate with a judge in an adversary proceeding about the merits of the cause without adequate notice to opposing counsel) in connection with Count Two.

## Count Three

{¶ 18} In November 2001, another client retained respondent to represent him in the Stark County Juvenile Court concerning child support for the client's two minor children, visitation, and name changes. At a hearing on July 26, 2002, respondent promised to prepare a judgment entry setting forth settlement terms to which the parties had agreed; however, he did not present the judgment entry in a timely fashion. On October 30, 2002, counsel for the children's mother filed a motion to dismiss the case, and the court entered a dismissal on the same day.

{¶ 19} From July 26, 2002, until December 2002, respondent's client made numerous attempts to learn the status of the case. Respondent failed to return the client's calls and canceled, without rescheduling, a meeting at his office.

{¶ 20} On December 31, 2002, respondent filed a motion to reopen the client's case and a proposed final-judgment entry reflecting the agreement reached by the parties on July 26, 2002. The judge immediately granted the motion to reopen and signed the judgment entry, changing terms relative to visitation and also decreeing that the children's names would be changed only upon motion.

{¶ 21} Respondent's delay in preparing and filing the judgment entry caused his client to miss a Christmas visit with his children. The delay also caused the client to retain other counsel. And because the children's mother had withheld visitation after July 26, 2002, respondent's delay prevented the client from taking advantage of other visitation terms to which the parties had also agreed on that day.

{¶ 22} The parties stipulated and the board found that respondent had committed a second violation of DR 6-101(A)(3) in connection with Count Three.

## Sanction

{¶ 23} In recommending a sanction for this misconduct, the board considered the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). As aggravating features, the board found that respondent's neglect of two clients and ex parte communication displayed a pattern of misconduct and multiple offenses. BCGD Proc.Reg. 10(B)(1)(c) and (d). Moreover, respondent's misconduct affected the lives of clients who are among the most vulnerable—those with cases pending in a family court. BCGD Proc.Reg. 10(B)(1)(h). The board also noted

that respondent had misinformed relator's investigator as to the status of the QDRO in Count One.

{¶ 24} As mitigating factors, the board found that respondent had no prior record of discipline, had repaid the $300 for the QDRO consultant in Count One, had eventually cooperated in the disciplinary process, and is reputed to be professionally competent and of good character. BCGD Proc.Reg. 10(B)(2)(a), (c), (d), and (e). Respondent also acknowledged the wrongful nature of his conduct and did not commit the misconduct out of self-interest. BCGD Proc.Reg. 10(B)(2)(b). Moreover, evidence showed that respondent had suffered from "Adjustment Disorder with Depressed Mood" during some of the underlying events and has since been successfully treated for his condition. BCGD Proc. Reg. 10(B)(2)(g).

{¶ 25} The board recommended, consistent with the parties' stipulations, that respondent be suspended from the practice of law for one year, with the entire year of suspension stayed on the conditions that respondent agree to supervision by a monitoring attorney and complete a variety of additional continuing legal education ("CLE") courses.

{¶ 26} Upon review, we agree that respondent violated DR 6–101(A)(3) and 7–110(B) and Gov.Bar R. V(4)(G) as found by the board. We further agree that a one-year suspension, stayed on the recommended conditions, is appropriate.

{¶ 27} In adopting the panel's report, the board observed that "but for the Respondent's misrepresentation to the Relator regarding the status of the QDRO, a much lesser sanction than that agreed to by the parties would be appropriate in this matter." With this statement, the board referred to the rule that professional misconduct involving dishonesty ordinarily requires an actual suspension, see, e.g., *Disciplinary Counsel v. Jaffe*, 102 Ohio St.3d 273, 2004–Ohio–2685, 809 N.E.2d 1122, although a stay may be warranted based on mitigating circumstances, *Cincinnati Bar Assn. v. Statzer*, 101 Ohio St.3d 14, 2003–Ohio–6649, 800 N.E.2d 1117, ¶ 21.

{¶ 28} Respondent testified that he had become frustrated with his former partner's lack of assistance in contending with clients before and after the partner's departure. He also explained that after writing to relator's investigator about having paid the consultant in Fowler's case, he got distracted and didn't follow through to finish the job as he should have. Concluding that "the parties have confronted the realities of the Respondent's conduct in this regard," the board was obviously satisfied that respondent had not intentionally misrepresented information during the investigation and, therefore, an actual suspension was not required. In fact, relator withdrew a charge that respondent violated DR 1–102(A)(4) (a lawyer shall not engage in conduct involving fraud, deceit, dishones-

ty, or misrepresentation). The board thus accepted, with slight modification, the parties' suggested sanction.

{¶ 29} We concur in the board's assessment, and having found the cited misconduct, we also adopt the board's recommendation. Respondent is therefore suspended from the practice of law in Ohio for one year; however, the suspension is stayed on the following conditions:

{¶ 30} 1. Respondent shall be placed on probation during the one year of his stayed suspension pursuant to Gov.Bar R. V(9) and submit to the supervision of a monitoring attorney, to be approved by relator, who will offer counsel concerning respondent's law-office management and other issues that arise in his law practice. Respondent shall meet with the monitoring attorney at least monthly; and

{¶ 31} 2. In addition to the requirements otherwise imposed upon him by Gov.Bar R. X(3), respondent shall also complete ten hours of accredited CLE on family law, two hours of CLE on ethics, and one hour of CLE on law-office management during the suspension.

{¶ 32} If respondent violates either of these conditions, the stay will be lifted, and respondent shall serve the entire year of suspension. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

———————

Richard S. Milligan, Bar Counsel, Wendy J. Rockenfelder and James M. Conley, for relator.

Charles L. Richards, for respondent.