DISCIPLINARY COUNSEL *v.* GRECO.

[Cite as *Disciplinary Counsel v. Greco,*
107 Ohio St.3d 155, 2005-Ohio-6045.]

(No. 2005–0799—Submitted June 15, 2005—Decided November 30, 2005.)

---

**Per Curiam.**

{¶ 1} Respondent, Anthony William Greco, of Columbus, Ohio, Attorney Registration No. 0061582, was admitted to the practice of law in Ohio in 1993.

{¶ 2} On June 7, 2004, relator, Disciplinary Counsel, charged respondent with numerous violations of the Code of Professional Responsibility. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and, based on the parties' stipulated facts and exhibits and other evidence, made findings of fact, conclusions of law, and a recommendation. The board adopted the panel's findings, conclusions, and recommended sanction.

## Misconduct

### The Amyx Grievance

{¶ 3} On April 1, 2002, William Amyx retained respondent to assist in collecting back wages from his employer. Respondent agreed to accept the case for $1,500, plus ten percent of any recovery. Respondent promised to send a demand letter to Amyx's employer and, if the letter proved unsuccessful, to file a lawsuit. Respondent agreed to be paid the $1,500 in two equal installments and told Amyx that he would draft the demand letter but not send it until the second installment had been paid.

{¶ 4} Amyx paid the last installment on April 12, 2002. Respondent told Amyx that day that he needed more time to draft the demand letter and would mail Amyx a copy.

{¶ 5} Amyx heard nothing from respondent for the next two weeks, so Amyx called respondent's office and left several messages for respondent to contact him. Approximately three weeks later, respondent advised Amyx that he was too busy to handle the case and that he was turning over Amyx's file to another attorney. Amyx agreed to the referral; however, the new attorney did not contact Amyx for several weeks and then missed a scheduled appointment to meet with Amyx. The attorney spoke to Amyx by telephone and asked him for the same information that Amyx had given respondent months before.

{¶ 6} Following that telephone conversation, Amyx left several messages for the attorney to call him, but he never did. When Amyx called respondent for help, respondent also did not return Amyx's calls.

{¶ 7} In November 2002, seven months after their first meeting, respondent advised Amyx that he was taking over the case again because the successor attorney had moved his office. Additional weeks passed during which respondent failed to advise Amyx of the status of the case or return his calls. Amyx sent respondent a letter asking for a refund, but he received no response. Respondent never sent a demand letter to Amyx's employer, and he never filed a lawsuit. On June 10, 2004, over two years after the initial meeting, respondent refunded Amyx's $1,500 retainer.

{¶ 8} As to the Amyx grievance, the parties stipulated and the board found that respondent had violated DR 1–102(A)(5) (a lawyer shall not engage in conduct that is prejudicial to the administration of justice), 1–102(A)(6) (a lawyer shall not engage in any conduct that adversely reflects on the lawyer's fitness to practice law), 2–106(A) (a lawyer shall not charge a clearly excessive fee), 2–110(A) (a lawyer who withdraws from employment shall promptly refund any part of a fee paid in advance that has not been earned), and 6–101(A)(3) (a lawyer shall not neglect a legal matter entrusted to him).

*The Mymo Grievance*

{¶ 9} On April 1, 2002, Victoria Mymo paid respondent $4,000 to represent her in a divorce action. Approximately one week later, Mymo informed respondent that she and her husband had agreed to a dissolution rather than a divorce. On April 12, 2002, Mymo and her husband met with respondent and signed the separation agreement and petition for dissolution. Mymo requested that respondent file the paperwork after May 31, 2002.

{¶ 10} On June 5, 2002, respondent mistakenly filed the Mymo case in Franklin County rather than Delaware County. Mymo later brought papers she had received from the Franklin County Child Support Agency to respondent, but he did not immediately tell her that the petition needed to be refiled. On July 18, 2002, respondent gave Mymo a new separation agreement and petition for dissolution that he had prepared for filing in Delaware County. Respondent asked Mymo to have her husband sign the documents, and she returned with the signed documents the following day. Respondent assured Mymo that he would file the dissolution that day or the following Monday.

{¶ 11} From late July through August 2002, Mymo called respondent's office repeatedly to learn the status of her case. Respondent failed to return her calls. Finally, in mid-August, respondent informed Mymo that her husband's signature, dated July 19, 2002, had not been notarized. The next day, Mymo's husband went to respondent's office and again signed the documents. Respondent promised Mymo that he would file the dissolution that day.

{¶ 12} One week later, Mymo called the Delaware County Common Pleas Court and discovered that the dissolution had not been filed. In September 2002,

Mymo's father contacted respondent. Respondent told Mymo's father that he had mistakenly filed the case in Franklin County and that he would hand-deliver the paperwork to Delaware County later that afternoon. Respondent filed the petition for dissolution 11 days later.

{¶ 13} Mymo learned from the court that the final hearing in her case was scheduled for October 31, 2002. Mymo thereafter called respondent many times, but he failed to return her calls. Respondent did not appear at the final hearing, and the court refused to grant Mymo the dissolution because she did not have a prepared dissolution decree and had not completed parenting classes. Respondent had never advised Mymo that she needed to attend parenting classes.

{¶ 14} The court rescheduled the final hearing for November 21, 2002, and in the interim, Mymo attempted to contact respondent repeatedly without success. Mymo finally prepared her own dissolution decree and obtained parenting-class certificates. Respondent also failed to appear at the November 21 hearing, but acting without counsel, Mymo submitted her papers. On the same day, the court granted her dissolution.

{¶ 15} In January 2003, Mymo filed a grievance against respondent. In September 2003, respondent refunded $1,500 of the $4,000 Mymo had paid him.

{¶ 16} As to the Mymo grievance, the parties stipulated and the board found that respondent had violated DR 1–102(A)(5) and (6), 2–106(A), 2–110(A), and 6–101(A)(3).

*The Lang Grievance*

{¶ 17} In January 2003, Melissa Lang retained an attorney for $1,000 to help her obtain child support from her son's father. In February 2003, that attorney referred the case to respondent and advised Lang that respondent would appear at Lang's February 25, 2003 court hearing to determine child support.

{¶ 18} On February 20, 2003, respondent met with Lang for the first time and asked for a $1,500 retainer. Respondent, with Lang's approval, rescheduled the February 25 court hearing to April 15, 2003. On February 24, 2003, Lang paid respondent $1,500 and agreed to meet respondent at his office the following Friday to sign an affidavit for temporary child support. Respondent failed to appear at the scheduled meeting.

{¶ 19} Over the following two weeks, Lang scheduled appointments to meet with respondent, but each time, respondent either failed to appear or had his secretary cancel the appointment.

{¶ 20} On March 11, 2003, respondent took the affidavit to Lang's office to obtain her signature. Respondent promised that he would file the affidavit with a motion for temporary child support the next day and that he would inform Lang of her hearing date. By March 17, 2003, respondent had not contacted Lang, so

she called him. Respondent falsely told Lang that he had filed the motion, that the clerk had not provided him with the hearing date, and that Lang would be notified of a hearing date by mail the following day.

{¶ 21} The next day, Lang did not receive anything from the court, and she left a message for respondent, who did not reply. One day later, Lang learned from the court that respondent had not filed the motion for temporary support.

{¶ 22} Lang called respondent again, but, again, he did not return her call. He did, however, return a call from Lang's father and conceded to him that he had not filed the motion for temporary support. On March 24 and 25, 2003, Lang telephoned respondent again. Respondent told her that he still did not have a court date and promised to call her later that day with the date. He never called.

{¶ 23} On March 27, 2003, Lang faxed a letter to respondent outlining the efforts she had made to contact him and threatening to file a grievance if he did not arrange a court date by March 31, 2003. Respondent immediately called Lang and promised to go to the courthouse as soon as he hung up and report back that day. On March 28, 2003, respondent called and told Lang that her temporary-support hearing was scheduled for April 15, 2003. On that same day, respondent filed the motion for temporary support that he claimed to have filed more than two weeks before.

{¶ 24} On April 14, 2003, respondent called Lang and relayed an offer from her son's father to pay $750 per month in temporary child support. Lang told respondent that she would settle for no less than $751 and that if the father did not agree, she wanted a judicial determination. On April 15, 2003, respondent appeared in court and advised the judge that his client had agreed to accept $750 per month as temporary child support.

{¶ 25} Lang became extremely upset upon learning that respondent had settled her case without her consent, but she did not realize that she could object. Respondent later presented an agreed entry for approval, but the court rejected it because paternity had not been established.

{¶ 26} On May 9, 2003, Lang left a message for respondent terminating his services. Her message also asked for a refund of the $1,500 retainer and for him to turn over her file to her. Respondent returned Lang's call, but acted unprofessionally toward her. In March 2004, respondent offered, through counsel, to reimburse Lang $750.

{¶ 27} As to the Lang grievance, the parties stipulated and the board found that respondent had violated DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(5) and (6), and 6–101(A)(3).

*The Davis Grievance*

{¶ 28} In August 2003, Donice Davis separated from her husband, and an attorney helped her obtain a civil protection order. That attorney referred Davis to respondent when she asked for representation in her impending divorce.

{¶ 29} Davis's husband filed for a divorce on September 15, 2003. On September 23, 2003, respondent agreed to represent Davis in the case for $225 an hour and asked Davis for a $2,500 retainer. Respondent allowed Davis to pay $1,300 as a first installment and to pay the additional $1,200 within the next two weeks.

{¶ 30} Over the next few weeks, Davis called respondent numerous times, but he did not return her calls. Respondent also twice agreed to meet Davis at his office to sign paperwork, but later canceled both meetings. On October 26, 2003, Davis met respondent at his office and signed papers. She also informed respondent that she would not pay the remaining $1,200 until she saw some results.

{¶ 31} The court set a final hearing in Davis's uncontested divorce for December 12, 2003. Throughout November, Davis attempted to get in contact with respondent, and when she could not, she asked her first attorney for help. That lawyer relayed to Davis a message that respondent planned to appear on her behalf at the final divorce hearing.

{¶ 32} Respondent failed to appear as promised, and Davis discovered that he had not appeared at all in the case, even to answer the complaint. Davis called respondent from the hearing, and he said that he was at the hospital with his son and had not known about the hearing. Davis gave the phone to the judge's bailiff, and respondent requested a continuance. The court, however, denied his request.

{¶ 33} Because of respondent's neglect, Davis was unrepresented and unprepared for her divorce hearing. And after the hearing, respondent continued to ignore her calls. On December 18, 2003, respondent agreed to refund the entire $1,300 Davis had paid.

{¶ 34} As to the Davis grievance, the parties stipulated and the board found that respondent had violated DR 1–102(A)(5) and (6), 2–106(A), 2–110(A), and 6–101(A)(3).

*The Fearn Grievance*

{¶ 35} In September 2003, Kerstin Fearn paid respondent a $1,225 retainer to represent her in a divorce. On October 20, 2003, Fearn signed the divorce papers, and respondent informed her that her husband would be served in seven to ten days.

{¶ 36} Three weeks later, after having heard nothing about the case, Fearn contacted respondent's office. A secretary said that Fearn's husband should have been served with the divorce papers. Fearn contacted the court and learned that her divorce had not been filed. Fearn attempted to contact respondent on numerous occasions about her discovery, but he failed to return her calls.

{¶ 37} When she finally reached respondent, Fearn terminated his services and demanded a full refund. Respondent apologized and offered to convert his retainer to a flat fee, with no additional payments regardless of how much work was required. Fearn accepted respondent's proposal.

{¶ 38} On November 20, 2003, Fearn contacted respondent to ask why the divorce had yet not been filed and to tell him that she needed temporary support. Respondent promised that Fearn's husband would be served by Thanksgiving or he would refund her money. By the end of November, the divorce still had not been filed. Fearn also discovered that respondent had moved his office without leaving a forwarding address.

{¶ 39} On December 4, 2003, respondent called Fearn to tell her that he had mailed a refund check by registered mail. Fearn never received the check. On December 9, respondent told Fearn to contact his secretary and ask her to track the registered mail. Respondent gave Fearn the wrong telephone number for the secretary. When Fearn did reach the secretary, the secretary stalled, would not give Fearn the address of respondent's new office, and provided her with a disconnected telephone number as the number for the new office.

{¶ 40} Fearn hired another attorney for $2,500 to complete the divorce. On June 10, 2004, respondent refunded Fearn's $1,225 retainer.

{¶ 41} As to the Fearn grievance, the parties stipulated and the board found that respondent had violated DR 1–102(A)(4), (5), and (6), 2–106(A), 2–110(A), and 6–101(A)(3).

*The Backus Grievance*

{¶ 42} In March 2002, respondent accepted a $1,500 retainer from Delbert and Vernetta Backus to represent them in breach-of-contract suit against a paving company. Thereafter, respondent inspected work performed by the company, reviewed a core-sample report, completed an asset search on the company, and drafted a complaint.

{¶ 43} Over the next several months, however, the Backuses' calls to respondent were not returned. On November 19, 2002, the couple sent a letter terminating respondent's representation and requesting a refund of their retainer. Respondent never responded to their letter. Respondent has since agreed to refund the $1,500 retainer.

{¶ 44} As to the Backus grievance, the parties stipulated and the board found that respondent had violated DR 1–102(A)(5) and (6), 2–106(A), 2–110(A), and 6–101(A)(3).

## Sanction

{¶ 45} In recommending a sanction for this misconduct, the board considered the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). In aggravation, the board found a pattern of misconduct and multiple offenses. Moreover, the board found that respondent had acted in his own self-interest in neglecting his obligations to his clients and avoiding honest explanations for his actions. BCGD Proc.Reg. 10(B)(1)(b), (c), and (d). In truth, respondent had begun to use cocaine and other illegal drugs and was also abusing alcohol.

{¶ 46} Against these factors, the board weighed the considerable extenuating circumstances surrounding respondent's misconduct. The board found that much of respondent's neglect and other misconduct was attributable to his diagnosed chemical dependency.

{¶ 47} Respondent's problem with drugs began in June 2001, when his law firm dissolved. He had recently gotten divorced, and so, within a short period of time, respondent had lost the two structured environments in his life. Respondent reacted to the losses by turning to alcohol, marijuana, and cocaine. He also began taking on more cases than he could effectively manage.

{¶ 48} In December 2003, respondent realized that his substance abuse, particularly of cocaine, was undermining his life and causing him to neglect his clients. Respondent decided to abstain from using cocaine. He isolated himself from his friends for 30 days and stopped practicing law for 90 days. Respondent eventually realized that alcohol was also a problem for him, and he then abstained from alcohol as well.

{¶ 49} Respondent immersed himself in recovery programs and treatment. He devoted himself to Alcoholics Anonymous ("AA"), at one point attending 93 meetings in 90 days. In May 2004, respondent enrolled in the Ohio Lawyers Assistance Program ("OLAP"). In June 2004, he signed a three-year contract with OLAP and has complied with every obligation under his agreement.

{¶ 50} Since becoming aware of his chemical dependency, respondent has fully committed himself to a lifetime of sobriety. He attends AA meetings three to four times a week and acknowledges that he will have to continue to go to AA meetings for the rest of his life. Additionally, respondent has recognized that he functions best in a highly structured setting. In February 2004, respondent

began working with one of his former partners, and they have returned to a firm-like setting with additional attorneys and support staff.

{¶ 51} In addition to respondent's diagnosis by OLAP, Dr. Kevin Arnold conducted a psychological evaluation of respondent. Arnold is an experienced clinical and forensic psychologist with a background in counseling and evaluating lawyers with substance-abuse problems. Arnold testified that respondent would be able to return to competent, ethical legal practice if he were supervised and worked in a law-firm setting. Arnold also testified that respondent is more likely to succeed in his recovery if he becomes more discriminating in his case selection, continues his participation in AA, and seeks counseling to deal with his depression.

{¶ 52} Because respondent has a diagnosed chemical dependency that contributed to his misconduct and has successfully completed treatment programs allowing his recovery and return to the competent, ethical professional practice of law, the board considered his condition a mitigating feature under BCGD Proc.Reg. 10(B)(2)(g). The board also found that respondent was extremely cooperative and forthcoming throughout the entire disciplinary process. Moreover, the board found respondent's expressions of remorse to be sincere. See BCGD Proc.Reg. 10(B)(2)(d).

{¶ 53} Respondent also submitted numerous letters attesting to his good character and reputation. See BCGD Proc.Reg. 10(B)(2)(e). In addition, respondent was forthright about his substance abuse and the underlying misconduct, and he has created a substantial support system for his recovery among medical professionals, colleagues, friends, and family. Moreover, respondent has apologized to the clients that he harmed and has agreed to make restitution.

{¶ 54} Citing as comparable cases *Disciplinary Counsel v. Jaffe*, 102 Ohio St.3d 273, 2004-Ohio-2685, 809 N.E.2d 1122, and *Stark Cty. Bar Assn. v. McKinney*, 101 Ohio St.3d 23, 2003-Ohio-6743, 800 N.E.2d 1125, relator requested that respondent be suspended from the practice of law for two years, with 18 months of the suspension stayed. The panel recommended a two-year suspension with the entire two years stayed on the condition that respondent continue to comply with his OLAP contract. The panel also recommended that respondent be placed on probation for two years. The board adopted the panel's findings of misconduct and recommended sanction.

## Review

{¶ 55} We agree with the board's findings that respondent violated DR 1-102(A)(4), (5), and (6), 2-106(A), 2-110(A), and 6-101(A)(3). However, consistent with *Jaffe* and *McKinney*, we find that a two-year suspension with 18 months stayed upon one condition and a two-year probation is the appropriate sanction.

{¶ 56} Respondent repeatedly frustrated numerous clients with his neglect of their cases. And when these clients asked him to refund their money, he delayed for long periods of time before reimbursing two clients in full and one client in part and agreeing to refund the fees paid by three other clients. Moreover, much of respondent's conduct affected the lives of clients who are among the most vulnerable—those with cases pending in family court. See *Stark Cty. Bar Assn. v. Arkow*, 104 Ohio St.3d 265, 2004-Ohio-6512, 819 N.E.2d 284, ¶ 23. Finally, despite respondent's extenuating circumstances, he repeatedly lied to his clients to cover up his neglect. See *Disciplinary Counsel v. Jaffe*, 102 Ohio St.3d 273, 2004-Ohio-2685, 809 N.E.2d 1122, ¶ 17.

{¶ 57} For these reasons, we believe that an actual suspension is necessary to protect the public. Accordingly, respondent is hereby suspended from the practice of law in Ohio for two years; however, 18 months of the suspension are stayed on the condition that respondent complies with his OLAP contract. If respondent violates the condition of the stay, the stay will be lifted and respondent shall serve the entire two-year suspension. In addition, respondent is placed on probation in accordance with Gov.Bar R. V(9) for the stayed portion of the suspension.

{¶ 58} In any application for reinstatement that he files pursuant to Gov. Bar R. V(10), respondent shall show, in addition to the requirements of that rule, that he has made restitution in the amount of $750 to Melissa Lang, $1,300 to Donice Davis, and $1,500 to Delbert and Vernetta Backus. Costs are taxed to respondent.

*Judgment accordingly.*

MOYER, C.J., RESNICK, LUNDBERG STRATTON, O'CONNOR and LANZINGER, JJ., concur.

PFEIFER and O'DONNELL, JJ., would suspend respondent for two years, all stayed.

———

Jonathan E. Coughlan, Disciplinary Counsel, and Joseph M. Caligiuri, Assistant Disciplinary Counsel, for relator.

David M. Abromowitz, for respondent.