CUYAHOGA COUNTY BAR ASSOCIATION *v.* WISE.

[Cite as *Cuyahoga Cty. Bar Assn. v. Wise,*
108 Ohio St.3d 164, 2006-Ohio-550.]

(No. 2005–0803—Submitted August 23, 2005—Decided February 22, 2006.)

## Per Curiam.

{¶ 1} Respondent, David M. Wise of Cleveland, Ohio, Attorney Registration No. 0037837, was admitted to the practice of law in Ohio in 1987. On December 22, 2003, relator, Cuyahoga County Bar Association, charged respondent in a two-count complaint with having violated the Code of Professional Responsibility. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and made findings of misconduct and recommended a sanction, all of which the board adopted.

### Findings of Misconduct

{¶ 2} The allegations of misconduct arose from respondent's representation of a mother in a custody dispute over her minor child. The child had been cared for since birth by the father's sister with help from the father's parents, and the aunt had asked the Cuyahoga County Juvenile Court to award her permanent custody. Respondent's client and her fiancé, the child's father, also wanted custody.

{¶ 3} The juvenile court judge gave temporary custody of the child to the aunt for the duration of the permanent-custody case. Later, at a hearing on January 29, 2003, the judge determined that the allegations in the complaint invoked a 90–day processing period that had already been exceeded in the case, a defect that the father raised in a motion to dismiss. The judge granted the father's motion to dismiss, a ruling that respondent believed operated to immediately return custody of the child to his client, the natural mother. At the conclusion of the proceeding, the judge stated from the bench that she was concerned for the child's well-being and safety and announced that she was going to immediately ask the Cuyahoga County Department of Children and Family Services to investigate whether being in the custody of her parents would put the child at risk. A case worker began an investigation that afternoon. The next day, January 30, 2003, the agency took the child into protective custody and formally placed the child in the aunt's care.

{¶ 4} After the January 29 hearing, the events underlying relator's complaint occurred. Almost immediately after the judge stated her intent to report the child's case to children services, respondent and the father's attorney advised their clients that they were free to take custody of the child. Respondent's client and the father left the courtroom and drove to two different daycare centers at

which the child had been enrolled. They could not find the child, however, because the child was ill that day and in the care of another relative.

{¶ 5} Either on the afternoon of January 29 or January 30, respondent learned that his client had been unable to find her child. The client was so distraught that she talked about pursuing kidnapping charges against the aunt. Respondent called the aunt's employer, the Cleveland Police Department. According to his testimony before the hearing panel, respondent called the police department to see if the aunt was working that day, surmising that she could not have run off with the child if she was on duty.

{¶ 6} Respondent called the police department at around 3:30 p.m. on January 30. He spoke to a police sergeant, one of the aunt's supervisors, and told him that he was representing a client in a custody dispute with the aunt and that his client had been awarded custody but that the child could not be located. He asked the sergeant to call the aunt and ask her to turn over the child. He said that if she did not turn the child over, kidnapping charges might be filed. The sergeant advised respondent that the aunt had not reported for duty that day or the day before, absences that the sergeant understood to be for family medical leave. Respondent replied that the aunt had been in court on January 29, a disclosure that caused the sergeant to question the aunt's explanation for her absences. Respondent further told the sergeant that he knew "Bill Mason," referring to the Cuyahoga County Prosecuting Attorney, and would personally go see him in order to get kidnapping charges filed.

{¶ 7} After speaking with respondent, the sergeant was able to reach the aunt and discuss respondent's concerns. At respondent's request, the sergeant called him back and relayed that the aunt had the child. The sergeant also relayed the aunt's request that respondent communicate with her only through her lawyer. Respondent asked the sergeant whether he knew where the child was. When the sergeant said that he did not, respondent said that he understood that there was a code of silence among police officers.

{¶ 8} At the panel hearing, respondent disputed the sergeant's recollection of their conversation. Respondent testified that he had mentioned the county prosecutor's name not as a threat, but as a word to the wise that Mason would "eat his own" if he found out that an officer had acted criminally. Respondent claimed that the sergeant had mistaken his remarks for an attempt to apply pressure, when he was merely trying to get information to prevent his client from filing criminal charges against the aunt.

{¶ 9} After calling the police department on January 30, respondent called Douglas Blackburn, the aunt's attorney. Blackburn testified that when he was told of the possible kidnapping charges, he had explained to respondent that custody remained with the aunt until the juvenile court journalized its entry,

which it had not yet done. Blackburn assured respondent of the child's where-abouts and promised that the aunt had no intention of running away with the child.

{¶ 10} According to Blackburn, despite being given these assurances, respondent referred during their conversation to his "good friend Bill Mason" in connection with pressing kidnapping charges. Blackburn also recalled that respondent had threatened to report the aunt's "misconduct" to another "friend," the city of Cleveland safety director.

{¶ 11} Respondent denied having made any threatening remarks to Blackburn and specifically denied having mentioned Mason or the safety director. He suggested that Blackburn was "confused" about the substance of their conversation because Blackburn had consulted with Ross Paul, the child's guardian ad litem, and the police sergeant in the course of the disciplinary investigation. Respondent explained that he and Paul had been on unfriendly terms even before Blackburn and Paul filed grievances against him. Respondent believed that Paul still held a grudge, especially since respondent had criticized his performance as guardian ad litem.

{¶ 12} Respondent acknowledged, however, that he had been "stern" with Blackburn during their telephone conversation. He recalled having warned Blackburn about the consequences if Blackburn was lying to him in assuring him that his client had not absconded with the child. Respondent testified that he had said, "[I]f I find out later on that that's not true, that you deceived me and [in] reliance upon your word I passed this information on to my client, I want you to understand something very clearly, you and I will have a serious problem man to man, not you and me and the courts, but you and I personally will have a serious problem on this issue. * * * [D]o you understand me?"

{¶ 13} When asked why he had told his client she could get her child immediately after dismissal of the custody complaint, even though the judge said she was going to call children services, respondent testified that he had been uncertain whether the judge would actually follow through. He said that he did not trust the judge's resolve because during the January 29 hearing, the judge "was highly agitated," "was asking [the parties] what she thought [they] ought to do," and was "flipflopping back and forth." According to respondent, the judge also "couldn't articulate from the bench what law she was proceeding under," and she "went on for 20 minutes about just being overturned in the Court of appeals and how this wasn't going to happen to her again."

{¶ 14} The panel and board found that respondent had resorted to intimidation tactics and suggestions that he would improperly influence public officials and had thereby violated DR 9–101(C) ("A lawyer shall not state or imply that he is able to influence improperly or upon irrelevant grounds any tribunal, legislative

body, or public official"), 7–102(A)(1) (in representing a client, a lawyer shall not "[f]ile a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another"), and 7–105(A) ("A lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter").

## Recommended Sanction

{¶ 15} In recommending a sanction for this misconduct, the panel and board weighed specified mitigating and aggravating factors and other relevant consider-ations in respondent's case. See Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commis-sioners on Grievances and Discipline ("BCGD Proc.Reg."). Adopting the panel's report, the board found in mitigation that respondent had no prior record of professional discipline and that neither dishonesty nor self-interest lay beneath his violations of the cited Disciplinary Rules. BCGD Proc.Reg. 10(B)(1)(a) and (b).

{¶ 16} Against these factors, the board weighed a series of aggravating circumstances. Apparently because the board did not believe respondent's testimony regarding his telephone conversations with Blackburn and the police sergeant and because respondent had failed to notify the panel that affidavits he had submitted contained incorrect dates, the board found that respondent had submitted false evidence at the hearing. BCGD Proc.Reg. 10(B)(1)(f). Second, respondent refused to accept any responsibility for his wrongdoing, insisting that the witnesses were either in a conspiracy against him or were confused. BCGD Proc.Reg. 10(B)(1)(g). Third, respondent had an improper motive for calling the aunt's employer, and his call caused her problems with her employer.

{¶ 17} Fourth, the board found that respondent had attempted to impede and obstruct the disciplinary process. The board believed that respondent's motions to disqualify relator's counsel were "an obvious effort to interfere with the orderly commencement of the hearing." In his written motion to disqualify all three attorneys for relator, respondent argued that one attorney should be disqualified because she and respondent had represented opposing parties in a contentious domestic-relations case. Respondent argued that the other two attorneys should be disqualified because he had included them on his witness list for the hearing before the panel. He claimed that he should be able to cross-examine those attorneys regarding affidavits that they had submitted to the probable-cause panel in response to his reply to the draft complaint. Respon-dent's motion was overruled, and, in his motion to reconsider, respondent added a claim that one of the attorneys had attempted to intimidate one of his witnesses.

{¶ 18} The board also noted that respondent had notified the panel on December 7, 2004, the day before the two-day hearing was to begin, that he was ill and might not attend the hearing. Respondent did appear at the hearing on December 8, but advised the panel that he would not be available for the second day of the hearing because he was under doctor's orders to undergo a medical test the next morning. The parties agreed to try to finish the hearing that day. Then, around 9:00 p.m. that night, respondent announced that one of his subpoenaed witnesses had failed to appear and he wanted to call him to appear the next day. When the chairman of the panel reminded respondent that he had said he could not be at the hearing the next day and that that was why they had all stayed late to finish the hearing, respondent said, "Actually, I will be here, I was ordered [by my doctor] not to be here today. I disregarded that order. I'll disregard tomorrow's order as well."

{¶ 19} The board was also displeased with respondent's refusal to stipulate to matters at the panel hearing, a strategy that placed even the customarily stipulated authenticity of official records in issue. Respondent subpoenaed the custodians of police, court, and other records for his defense; however, he never called the custodians as witnesses, because he was able to rely on copies of official records submitted by relator as exhibits. Moreover, when faced with a motion to quash his subpoena for the Cuyahoga County Prosecutor, respondent canceled the subpoena, accepting in substitute an affidavit by the prosecutor stating that the prosecutor did not know respondent.

{¶ 20} Respondent argued that relator had failed to prove any misconduct and urged dismissal of the complaint. He alternatively insisted that if the panel found any Disciplinary Rule violations, the sanction at most should be a public reprimand. Arguing that respondent had committed serious misconduct and was overly contentious in his defense strategy, relator argued for a one-year suspension of respondent's license and monitored supervision of his practice upon reinstatement.

{¶ 21} The board and panel agreed that the aggravating circumstances of respondent's case warranted a more exacting sanction than his misconduct alone would have justified. Adopting the panel's report, the board recommended that respondent be suspended from the practice of law for one year with six months of the suspension stayed on the condition that respondent commit no further professional misconduct during the period of his suspension.

Review

{¶ 22} Respondent filed objections, arguing that the violations of DR 9–101(C), 7–102(A)(1), and 7–105(A) were not proved with clear and convincing evidence. In the alternative, respondent asserts that a public reprimand is the appropriate sanction if we do find misconduct. Relator also filed objections, arguing that

respondent's misconduct and refusal to duly cooperate in the disciplinary proceedings warrant a one-year actual suspension with a provision for monitoring his practice upon reinstatement. We overrule all the objections.

*Misconduct*

{¶ 23} Respondent insists that he did not intend to harass the aunt in the underlying custody dispute, that he did not threaten criminal charges against the aunt to gain an advantage in the custody matter, and that he did not mean to imply that he could improperly influence public officials to take action adverse to the aunt. Respondent claims that his intentions were to try to prevent the aunt from being prosecuted for kidnapping and at the same time ensure that no one absconded with the child, whom he believed his client had immediate legal custody of as a result of the juvenile judge's dismissal. The panel, and later the board, found respondent's explanation for his actions implausible, and so do we.

{¶ 24} Unless the record weighs heavily against a hearing panel's findings, we defer to the panel's credibility determinations, inasmuch as the panel members saw and heard the witnesses firsthand. *Cincinnati Bar Assn. v. Statzer*, 101 Ohio St.3d 14, 2003-Ohio-6649, 800 N.E.2d 1117, ¶ 8. Here, we have no trouble seeing why the panel credited relator's witnesses over respondent's testimony.

{¶ 25} The panel found credible the testimony of the police sergeant, who had no involvement in the custody proceedings, and of Blackburn, who demonstrated an even-tempered professionalism when faced with respondent's attacks against him. These witnesses' similar recollections of their conversations with respondent corroborated the fact that respondent had resorted to the same improper tactics with each of them. Moreover, respondent conceded that he had never really suspected the aunt of kidnapping or believed that criminal charges were warranted. Thus, we agree with the board that respondent's mentioning that the county prosecutor was his friend in connection with threatening to bring kidnapping charges was intended to intimidate and suggest that he could improperly influence the prosecutor in order to gain cooperation in locating his client's child. We therefore find that he violated DR 7–105 and 9–101(C).

{¶ 26} We further reject respondent's claim that he did not telephone the aunt's employer to harass or maliciously injure the aunt. Respondent recognized that he could not ethically communicate directly with the aunt without her counsel's permission, see DR 7–104(A)(1), and insists that all he intended to do when he called the aunt's employer on January 30 was to find out whether she was at work. But respondent did not simply ask whether the aunt was on duty; he held on through several transfers to reach the aunt's supervisor and proceeded to report the aunt's personal troubles. Respondent then exacerbated the situation by suggesting that the aunt was involved in a kidnapping. Thus, we defer to

the panel's determination that respondent's communications with the aunt's employer violated DR 7–102(A)(1).

{¶ 27} In finding this misconduct, we also reject as completely unfounded respondent's remaining arguments. He claims that he could not have violated DR 7–105 because the juvenile court judge had dismissed the aunt's complaint for permanent custody. His argument ignores that DR 7–105 precludes threats of criminal prosecution to gain advantage in a civil *matter*. This prohibition obviously extends to all civil claims, whether or not they are currently pending in court, and the custody dispute underlying these proceedings had clearly not been resolved. Respondent also argues that he could not have violated DR 9–101(C), because he was not in reality acquainted with the county prosecutor or city safety director. DR 9–101(C), however, prohibits a lawyer from *implying* that he is able to improperly influence a public official.

*Sanction*

{¶ 28} When imposing a sanction for attorney misconduct, we consider the duties violated, the actual or potential injury caused, the attorney's mental state, the existence of aggravating or mitigating circumstances, and sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli,* 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818.

{¶ 29} We find that in violating DR 9–101(C), 7–102(A)(1), and 7–105, respondent compromised his duty to promote confidence in the legal system and the legal profession. Second, his misconduct hurt one of the legal system's most vulnerable victims, a litigant in family court. *Stark Cty. Bar Assn. v. Arkow,* 104 Ohio St.3d 265, 2004-Ohio-6512, 819 N.E.2d 284, ¶ 23. Third, respondent committed the misconduct, realizing that the aunt was emotionally fragile after having had her complaint for permanent custody dismissed.

{¶ 30} Fourth, we agree with the board's findings of aggravating and mitigating factors, including that respondent failed to cooperate in the disciplinary proceedings. Lawyers are entitled to zealously defend themselves against charges of misconduct; however, they are no less bound by the standards of professionalism in these proceedings than any other. Respondent's refusal to observe usual customs and courtesies justified the recommendation to enhance the sanction for his misconduct.

{¶ 31} On the other hand, respondent's attempts to have counsel disqualified were not totally specious, nor was respondent responsible for every delay. Thus, contrary to relator's argument, this case is not in the same category as *Stark Cty. Bar Assn. v. Watterson,* 103 Ohio St.3d 322, 2004-Ohio-4776, 815 N.E.2d 386, a case in which the lawyer (1) requested four extensions to file an answer so that he could obtain counsel and then filed an answer pro se, (2) doggedly asserted a nonexistent conflict to prevent the Stark County Bar Association from prosecut-

ing the case against him, and (3) moved this court for removal of the panel chairperson because she had overruled his motion to disqualify. We dismissed Watterson's motion sua sponte and later cited him for contempt for repeatedly failing to appear for his deposition. See id. at ¶ 13. Responding to these and many additional efforts to hinder the disciplinary process, we said:

{¶ 32} "Respondent persistently missed deadlines and otherwise obstructed the process in order to defend against the disciplinary charges. He unjustifiably and repeatedly accused various participants in the process of some impropriety. Relator's counsel aptly described respondent's behavior as 'exasperating.'" Id. at ¶ 42.

{¶ 33} Finally, none of the cases cited by the parties involves misconduct that precisely resembles respondent's offenses. The cases involving the most similar misconduct are *Disciplinary Counsel v. Watson,* 95 Ohio St.3d 364, 2002-Ohio-2222, 768 N.E.2d 617, and *Cincinnati Bar Assn. v. Cohen* (1999), 86 Ohio St.3d 100, 712 N.E.2d 118, in which lawyers threatened their clients with criminal charges because the clients had written them bad checks, and *Disciplinary Counsel v. Cicero* (1997), 78 Ohio St.3d 351, 678 N.E.2d 517, in which a defense lawyer boasted of his having a romantic relationship with a judge and suggested that the judge would rule in his clients' favor for that reason. Watson was suspended from practicing law for one year because he had also committed a variety of other misconduct and refused to accept responsibility for his actions. Cohen was publicly reprimanded after he conceded his single instance of wrongdoing. Cicero was suspended for one year for engaging in conduct prejudicial to the administration of justice, a violation of DR 1–102(A)(5), and failing to act with respect toward the courts, a violation of Gov.Bar R. IV(2).

{¶ 34} Respondent did not commit as many Disciplinary Rule violations as Watson did or impugn the integrity of a court, as Cicero did. He did, however, fail to acknowledge his serious misconduct and unnecessarily complicate these proceedings. We therefore find the board's recommendation appropriate.

{¶ 35} Respondent is therefore suspended from the practice of law in Ohio for one year. The last six months of this suspension are stayed on the condition that respondent commit no further Disciplinary Rule violations. If respondent violates the condition of the stay, the stay shall be lifted, and respondent shall serve the entire one-year suspension. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON and O'DONNELL, JJ., concur.

LANZINGER, J., concurs in judgment only.

O'CONNOR, J., dissents and would suspend respondent for one year.

Ellen S. Mandell, Bar Counsel, Jon F. Deegan, and Lenore Kleinman, for relator.

David M. Wise, pro se, and Stephen McGowan.