**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Perrico*, **Slip Opinion No. 2024-Ohio-1540.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-1540

DISCIPLINARY COUNSEL *v.* PERRICO.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Perrico*, Slip Opinion No. 2024-Ohio-1540.]**

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct—Two-year suspension with one year conditionally stayed.*

(No. 2023-1274—Submitted November 14, 2023—Decided April 25, 2024.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2023-002.

_____

**Per Curiam.**

{¶ 1} Respondent, Daniel Edward Perrico, of Westlake, Ohio, Attorney Registration No. 0071617, was admitted to the practice of law in Ohio in 1999.

{¶ 2} In a February 2023 complaint, relator, disciplinary counsel, charged Perrico with two ethical violations arising from an incident in which he provided alcohol to his stepdaughter, who was under the age of 18, and two of her friends,

both of whom were under 21, and also inappropriately touched one of those friends. As a result of the same conduct, Perrico was criminally charged with three counts of furnishing alcohol to an underage person and one count of sexual imposition. He entered guilty pleas to two counts of furnishing alcohol to an underage person (the count involving his stepdaughter was dismissed) and an amended count of assault.

{¶ 3} Although Perrico's convictions have been sealed by court order, he has waived any claim of privacy, consented to the release of the sealed records for use in this proceeding, and admitted to his convictions. The parties submitted stipulations of fact and nine stipulated exhibits, and the matter proceeded to a hearing before a three-member panel of the Board of Professional Conduct. Based on the stipulations, exhibits, and the hearing testimony of Perrico, the three young women to whom he furnished alcohol, and Perrico's former wife, the panel found that Perrico committed the charged misconduct. The panel recommended that Perrico be suspended from the practice of law for two years, with one year conditionally stayed, and that certain conditions be placed on his reinstatement to the profession. The board adopted the panel's report and recommendation, and no objections have been filed. After a thorough review of the record, we adopt the board's findings of misconduct and the recommended sanction.

## MISCONDUCT

{¶ 4} T.B. was three years old when Perrico married her mother, K.P., in September 2007. T.B. had a complicated relationship with her biological father and considered Perrico as her father.

{¶ 5} In the spring of 2019, T.B. was a freshman in high school. While participating on her high-school track team, she met and befriended two other girls, C.P. and B.R., both of whom were seniors. Like T.B., those friends had complicated family relationships and began to regard Perrico as a father figure in whom they could confide. For example, C.P. and T.B. told Perrico that T.B. had

been allowed to drive B.R.'s car and drove it into a ditch, though the car was not damaged. T.B. also told Perrico that she drank alcohol during a party at B.R.'s home around the time C.P. and B.R. graduated from high school in June 2019. In addition, C.P. told Perrico that she was interested in attending culinary school, and Perrico agreed to teach her how to cook some of his recipes. Moreover, both C.P. and B.R. had Perrico's cellphone number. They did not, however, have a similarly close relationship with T.B.'s mother.

**{¶ 6}** Following their graduation in June 2019, C.P. and B.R. maintained their friendship with T.B. One Friday in September 2019, they made plans to spend the night at T.B.'s house while her mother was out of town. At that point, Perrico was 45 years old, B.R. and C.P. were 18, and T.B. was only 15. That evening, while T.B. was at a high-school football game and B.R. was at work, C.P. went to T.B.'s house to learn how to make one of Perrico's recipes. Upon her arrival, Perrico directed C.P. to surrender her keys. At times while Perrico and C.P. were cooking, he stood close to her and caressed her arms. He also gave her alcoholic mixed drinks and shots.

**{¶ 7}** T.B. returned home from the football game at approximately 10:00 p.m., and Perrico gave her alcoholic mixed drinks and shots and provided C.P. with additional drinks; both young women were intoxicated by the time B.R. arrived at the house around midnight. Upon B.R.'s arrival, Perrico directed her to surrender her keys. At some point that evening, Perrico handed B.R. an alcoholic drink and told her that she had to drink it as punishment for allowing T.B. to drink alcohol during B.R.'s graduation party. Perrico provided B.R. with additional alcoholic drinks throughout the night. He played drinking games with all three young women, and both C.P. and B.R. drank to the point that they got sick from the alcohol they had consumed.

**{¶ 8}** C.P. went into the bathroom in the basement of Perrico's house, while B.R. went into a bathroom upstairs. Perrico went into the basement bathroom with

C.P. During Perrico's disciplinary hearing, C.P. testified that Perrico sat down next to the toilet, pulled her "into his lap," and then started touching her over her clothes on the vagina, thighs, breasts, and arms. C.P. also testified that while Perrico was in the bathroom with her, he said, "All the dirty things I could do to you right now."

{¶ 9} T.B. went down to the basement to check on C.P. several times. She testified that each time, she found the bathroom door was closed, even though she left it open every time she went back upstairs to check on B.R; in his testimony, Perrico denied that he closed the door and suggested that C.P. had kicked it shut. Eventually, Perrico and T.B. moved C.P. out of the bathroom. T.B. testified that she took C.P.'s feet and that she saw Perrico put his arms under C.P.'s armpits and place his hands on her breasts. After they placed C.P. onto a couch in the basement, T.B. told Perrico that she could manage without his assistance. Perrico left the basement and did not return.

{¶ 10} On Saturday morning, C.P. and B.R. got up and left Perrico's house at around 8:00 a.m. That day, B.R. was very sick with a kidney infection and stayed at C.P.'s apartment. C.P. texted Perrico, stating, "U killed [B.R.] she never drinks that much and now shes dying." (Spelling and punctuation sic.) Perrico replied by text, stating, "I have no idea what you're talking about?" That statement was followed by a smiley-face emoji with a halo over it. C.P. texted Perrico again, stating, "U broke my best friend shes at my house dying." (Spelling and punctuation sic.)

{¶ 11} Over the next couple of months, C.P., who lived alone and apparently had no family support, texted Perrico to ask if he was willing to give her money to pay her rent and cosign on a loan for a car. The board noted that not only did C.P. feel close enough to Perrico to ask him for a loan, but that Perrico's text messages to her suggested that he actually gave her money for her rent.

{¶ 12} At some point, C.P. told B.R. and T.B. what Perrico had done to her, but the young women agreed not to tell anyone else what had happened because

4

T.B. was fearful that disclosure of the events of that night might end her mother's already strained marriage to Perrico. Upset about Perrico's conduct with C.P., T.B. was diagnosed with anxiety and began seeing a therapist.

{¶ 13} In early February 2020, T.B. finally told her mother what had happened during the sleepover. After meeting with her attorney, T.B.'s mother demanded that Perrico leave the marital residence. Later that month, T.B., C.P., and B.R. met with a Summit County sheriff's deputy. The deputy had C.P. place a recorded phone call to Perrico. During that call, C.P. accused Perrico of getting her "wasted," grabbing her "boob," and rubbing her leg. Perrico did not deny the accusations at any time during the recorded call. Instead, he stated that he did not recall doing any of those things, and that if he had done those things, he was sorry. At his disciplinary hearing, however, Perrico adamantly denied C.P.'s accusations.

{¶ 14} On February 24, 2020, Perrico was charged in the Stow Municipal Court with three counts of furnishing alcohol to an underage person, and one count of sexual imposition. That same day, T.B.'s mother filed for divorce. Perrico later asked the municipal court to amend the sexual-imposition charge, a third-degree misdemeanor, to a first-degree-misdemeanor charge of assault. The board noted that a conviction of the lesser offense of sexual imposition would have caused Perrico to be classified as a sex offender and subjected him to sex-offender registration requirements under R.C. Chapter 2950. Perrico pleaded guilty to two counts of furnishing alcohol to an underage person and the amended count of assault. The third count of furnishing alcohol was dismissed because T.B. was Perrico's stepdaughter.

{¶ 15} In June 2020, Perrico was sentenced to a 180-day suspended jail term and 12 months of community control for each of the three counts of which he was convicted. He was also ordered to pay fines and court costs and to have no contact with C.P. and B.R. He received an early release from his community control, and his convictions were sealed prior to relator's filing of the complaint in this case.

Following the final divorce hearing, his former wife, K.P., also an attorney, reported Perrico's convictions to relator.

{¶ 16} The board found that Perrico's disciplinary-hearing testimony regarding his role in the young women's drinking and his conduct with C.P. was either not credible or contradicted his prior statements in at least four respects.

{¶ 17} First, the board found that Perrico admitted during his disciplinary hearing that he had provided alcohol to the young women and that it was a bad decision and against the law. However, the board also noted that Perrico attempted to portray his role in the young women's underage drinking as passive and that he suggested that they were experienced drinkers who drank voluntarily that night. While he admitted that he had provided mixed drinks and shots to C.P., Perrico also testified that he was "not sure" if he had poured drinks for T.B., and he denied that he had "actually poured" shots for the young women. Perrico also suggested that T.B. "was very comfortable pouring her own drinks" and that *she* had poured shots for people. However, C.P. and T.B. testified that they had little experience with alcohol, and all three young women testified that Perrico was the one pouring the alcohol and encouraging them to drink.

{¶ 18} Second, the board noted that during his disciplinary hearing, Perrico admitted that he had said, "All the things I could do to you" to C.P. but that he also claimed that he had made the statement when he and C.P. were in the kitchen "sparring and playing around." Although he claimed that the statement was not sexual in nature, he offered no explanation for why he made it. Nor did he explain what he meant by "sparring and playing around." The board concluded that Perrico's statement indicated that "he was interested in having a sexual relationship with C.P." and that "[t]here is simply no other reasonable context for that remark."

{¶ 19} Third, the board found that Perrico's adamant denial before the panel of improperly touching C.P. was not credible given his failure to deny those allegations when raised by C.P. during the recorded telephone call. In his testimony

before the panel, Perrico suggested that he had failed to deny the allegations because he received the call at 1:00 a.m. and was groggy from sleeping pills that he had taken earlier that night. But citing Perrico's testimony that he believed T.B. was listening to the call and that he was trying to "get a message to her," the board concluded that he was "thinking clearly" during the call. The board also emphasized that during the call, Perrico apologized for alleged misconduct that he claimed he had no recollection of committing.

{¶ 20} Finally, Perrico testified that he had pleaded guilty to the assault charge because, in his mind, he felt that giving C.P. alcohol, which caused her to get sick, was a form of assault. But in his written response to relator's letter of inquiry in November 2021, he stated that he had entered his guilty plea to avoid any risk of being convicted of sexual imposition and labeled a sex offender. And during his deposition just one month before his disciplinary hearing, he testified that the assault he pleaded guilty to was "an unwanted touch apparently."

{¶ 21} Given the multiple inconsistencies in Perrico's statements and testimony, the board found the testimony of C.P., T.B., and B.R. to be more credible. Citing C.P.'s testimony, the board found that Perrico had touched C.P. in a sexual manner and that his conduct constituted sexual imposition, a third-degree misdemeanor, even though he was not convicted of that offense. All told, Perrico's conduct with C.P. and B.R. that night resulted in the commission of three misdemeanor offenses against young women who looked up to him as a father figure.

{¶ 22} On these facts, the board found by clear and convincing evidence that Perrico violated Prof.Cond.R. 8.4(b) (prohibiting a lawyer from committing an illegal act that reflects adversely on the lawyer's honesty or trustworthiness). Furthermore, the board concluded that the conduct giving rise to that violation was sufficiently egregious under *Disciplinary Counsel v. Bricker*, 137 Ohio St.3d 35, 2013-Ohio-3998, 997 N.E.2d 500, ¶ 21, to warrant an additional finding that

Perrico's conduct violated Prof.Cond.R. 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law). We adopt these findings of misconduct.

## RECOMMENDED SANCTION

{¶ 23} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 24} In this case, the board has found that three aggravating factors are present. First, Perrico acted with a selfish and dishonest motive. *See* Gov.Bar R. V(13)(B)(2). Knowing that it was against the law, he furnished alcohol to underage females and "aggressively pushed them to drink." He then took advantage of C.P.'s intoxication to advance his interest in a sexual relationship with her. Perrico also failed to acknowledge the wrongful nature of his misconduct and attempted to walk back some of the admissions he had made to relator. *See* Gov.Bar R. V(13)(B)(7). Furthermore, Perrico caused harm to three vulnerable young women who looked up to him as a father figure. *See* Gov.Bar R. V(13)(B)(8). He purposely furnished them with alcoholic mixed drinks and shots of liquor and urged them to drink, knowing that the alcohol would impair their judgment. Perrico's planned and predatory conduct made C.P. and B.R. physically ill. It also gave him the opportunity to be alone with C.P. and to engage in unwelcome sexual contact with her.

{¶ 25} Although the criminal charge for furnishing alcohol to T.B. was dismissed because Perrico was her stepfather, she was also a victim of his misconduct. She had been diagnosed with an anxiety disorder for which she was still being treated at the time of the panel hearing, nearly four years after the incident giving rise to this case. Moreover, the board's report noted that T.B.'s testimony was emotional and that she was "clearly devastated" by the loss of the only father

figure she had ever known—a man who essentially called her a liar on the witness stand.

{¶ 26} As for mitigating factors, Perrico has no prior discipline. *See* Gov.Bar R. V(13)(C)(1). He exhibited a cooperative attitude toward the disciplinary proceedings by consenting to the reopening of his sealed criminal convictions, waiving any objections to the admission of the case file and testimony related to his convictions, and traveling to Columbus for his deposition. *See* Gov.Bar R. V(13)(C)(4). Perrico also had other penalties or sanctions imposed for his misconduct—namely, the community control, fines, and costs imposed for his criminal convictions. *See* Gov.Bar R. V(13)(C)(6).

{¶ 27} Although Perrico presented the testimony of one character witness and letters from two others, the board declined to afford any mitigating effect to that evidence given the witnesses' apparent lack of knowledge regarding Perrico's criminal convictions or the allegations in relator's complaint.

{¶ 28} "[T]he primary purpose of disciplinary sanctions is not to punish the offender, but to protect the public." *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 53. In this case, relator urged the board to recommend a suspension of two years with 12 months stayed on the condition that Perrico engage in no further misconduct. Perrico argued that *if* he is found to have committed any ethical violations, his misconduct warrants no more than a public reprimand or fully stayed suspension.

{¶ 29} In determining the appropriate sanction for Perrico's misconduct, the board noted that this court has not previously disciplined an attorney convicted of furnishing alcohol to underage persons. The board considered three cases in which we imposed fully stayed suspensions on attorneys for single violations of Prof.Cond.R. 8.4(b) or 8.4(h) arising from misdemeanor offenses, including assault, permitting drug abuse, and solicitation. *See Disciplinary Counsel v. Camboni*, 145 Ohio St.3d 395, 2016-Ohio-653, 49 N.E.3d 1284 (imposing a

conditionally stayed one-year suspension based on an attorney's misdemeanor conviction for assault); *Cincinnati Bar Assn. v. Glaser*, 146 Ohio St.3d 102, 2016-Ohio-3052, 52 N.E.3d 1186 (imposing a conditionally stayed six-month suspension on an attorney convicted of attempting to permit drug abuse in her home); *Disciplinary Counsel v. Hillis*, 139 Ohio St.3d 319, 2014-Ohio-2113, 11 N.E.3d 1156 (imposing a conditionally stayed six-month suspension on an elected part-time city law director who pleaded no contest to misdemeanor offenses of solicitation and criminal trespass after he was found with a known prostitute in his parked car on private property).

**{¶ 30}** In contrast to the three aggravating factors present in this case, there were no aggravating factors present in *Glaser* or *Hillis*, and just one in *Camboni*—a conviction for driving while intoxicated during the pendency of the disciplinary proceedings. *See Glaser* at ¶ 8; *Hillis* at ¶ 4; *Camboni* at ¶ 9. And in addition to the mitigating factors present here, Camboni did not act with a selfish or dishonest motive, *Camboni* at ¶ 9, Glaser presented evidence of her good character, *Glaser* at ¶ 8, and Hillis made a timely, good-faith effort to rectify his misconduct, presented evidence of his good character, and established a qualifying mental disorder, *Hillis* at ¶ 4.

**{¶ 31}** The board found that the misconduct in this case was more serious than the misconduct at issue in *Camboni*, *Glaser*, and *Hillis*, because Perrico's actions were "preplanned, predatory, and committed against vulnerable young victims who considered him to be a father figure." Moreover, Perrico's testimony on many issues during his disciplinary hearing was simply not credible.

**{¶ 32}** The board found that the facts of this case were more comparable to those of *Cincinnati Bar Assn. v. Kenney*, 110 Ohio St.3d 38, 2006-Ohio-3458, 850 N.E.2d 60. In that case, a 21-year-old man accused Kenney of having unlawful sexual contact with him. *Id*. at ¶ 5. Kenney initially denied the allegations in a police interview, but he later confessed that he had touched the victim's stomach

while the victim was sleeping on a sofa in Kenney's home. *Id.* He ultimately pleaded guilty to a single third-degree-misdemeanor count of sexual imposition. *Id.* at ¶ 3.

{¶ 33} Kenney was sentenced to 60 days in jail, with 50 days suspended, and two years of probation that required him to participate in "psychological therapy and complete an outpatient drug program." *Id.* Based on the conduct underlying his conviction, we found that he violated former disciplinary rules that prohibited lawyers from engaging in illegal conduct involving moral turpitude and conduct involving dishonesty, fraud, deceit, or misrepresentation. *Id.* at ¶ 12; *see* former DR 1-102(A)(3) and (4). Like Perrico, Kenney acted with a selfish or dishonest motive and caused harm to a vulnerable victim after a night of overindulging in alcohol. *Kenney* at ¶ 9. But Kenney's misconduct involved only a single victim. And in contrast to Perrico, Kenney made additional efforts to rectify the consequences of his wrongdoing beyond pleading guilty to his underlying criminal conduct; he commenced alcohol-abuse and behavioral-modification counseling. *Id.* at ¶ 8. He also submitted numerous letters in support of his good character. *Id.* We suspended Kenney from the practice of law for two years with 18 months stayed on conditions related to maintaining his sobriety. *Id.* at ¶ 13.

{¶ 34} Citing the "preplanned [and] predatory" nature of Perrico's misconduct, the vulnerability of the young victims, Perrico's refusal to admit that his conduct violated the Rules of Professional Conduct, and the fact that his testimony on many issues was not credible, the board concluded that an actual suspension is necessary to protect the public. The board therefore recommends that we suspend Perrico for two years with one year stayed. In addition, the board recommends that his reinstatement be conditioned on proof that he has submitted to an alcohol-abuse assessment conducted by the Ohio Lawyers Assistance Program ("OLAP") or a qualified chemical-dependency professional and complied

with any treatment recommendations and/or OLAP contract arising from that evaluation.

{¶ 35} In *Disciplinary Counsel v. Carter*, __ Ohio St.3d __, 2023-Ohio-3992, __ N.E.3d __, we recently disciplined an attorney who lured the mother of a client's child to his office under the false pretense of discussing the client's case and then coerced her into engaging in a sexual act to "reward" him for his legal work. *Id*. at ¶ 10-13. During a police interview, Carter falsely denied having had any sexual contact with the victim; but when confronted with evidence to the contrary, he placed all the blame for his misconduct on his victim and claimed that the sexual activity was consensual. *Id*. at ¶ 15. In contrast to Perrico, Carter was never criminally charged for the misconduct underlying his disciplinary case. *Id*. at ¶ 22. Nevertheless, we found that Carter's continued refusal to acknowledge the seriousness and wrongfulness of his conduct undermined confidence in the legal profession and that he posed a continuing threat to his clients and the public. *Id*. at ¶ 41. Over Carter's objection, and in light of many of the same aggravating and mitigating factors present in this case, we rejected the board's recommendation that he be suspended from the practice of law for six months and instead suspended him for two years with one year conditionally stayed. *Id*. at ¶ 30, 41.

{¶ 36} In contrast to *Carter*, the misconduct at issue in this case was entirely unrelated to Perrico's practice of law. However, his predatory conduct is arguably more egregious because he exploited the trust that *three* underage young women had placed in him, knowingly plied them with alcohol to the point that two of them were physically ill and/or passing out, and then made a sexually charged comment about "all of the dirty things" he could do to one of the young women before inappropriately touching her body. Perrico's failure to acknowledge the wrongful nature of his misconduct—and more specifically his disciplinary-hearing testimony attempting to minimize his conduct, blame his victims for his misconduct, and walk back his prior statements and admissions to relator—demonstrates that he, like

Carter, presents a real and continuing threat to the public. We therefore agree that the board's recommended sanction of a two-year suspension, with one year conditionally stayed, and additional conditions on reinstatement to the profession is the appropriate sanction in this case.

## CONCLUSION

{¶ 37} Accordingly, Daniel Edward Perrico is hereby suspended from the practice of law in Ohio for two years with one year stayed on the condition that he engage in no further misconduct. If Perrico fails to comply with the condition of the stay, the stay will be revoked, and he will be required to serve the full two-year suspension. In addition to the requirements for reinstatement set forth in Gov.Bar R. V(24), Perrico shall provide proof that he has submitted to an alcohol assessment conducted by OLAP or a qualified chemical-dependency professional and that he has complied with any OLAP contract and/or treatment recommendations arising from that evaluation. Costs are taxed to Perrico.

Judgment accordingly.

FISCHER, DEWINE, and STEWART, JJ., concur.

DONNELLY, J., concurs, with an opinion.

KENNEDY, C.J., concurs in part and dissents in part, with an opinion joined by DETERS, J.

BRUNNER, J., not participating.

_____

**DONNELLY, J., concurring.**

{¶ 38} I join the majority's decision adopting the Board of Professional Conduct's findings of misconduct against Daniel Edward Perrico and the board's recommended sanctions. *See* majority opinion, ¶ 22, 36. I write separately, however, because this case provides another example of an attorney facing criminal charges being permitted to plead guilty to an offense that is disconnected from the attorney's alleged criminal conduct. And while the board nonetheless managed to

13

craft an appropriate sanction here, one can easily imagine how these factually baseless plea agreements undermine the board's ability to do its job.

{¶ 39} The facts underlying Perrico's misconduct start out benign but quickly take an unnerving turn. Perrico's then 15-year-old stepdaughter, T.B., invited two of her friends, C.P. and B.R., over on a Friday evening to spend the night. C.P. and B.R. were both 18 years old. Over the course of the evening, Perrico—then 45 years old—provided alcoholic beverages to his stepdaughter and her friends. Their drinking continued until T.B.'s friends both got so drunk that they became physically ill, with C.P. ending up in the home's basement bathroom. At some point, Perrico went down to the basement bathroom, where he spent several minutes alone with C.P. And while they were alone, Perrico allegedly pulled C.P. onto his lap and touched, over her clothes, C.P.'s breasts, vagina, thighs, and arms.

{¶ 40} Several months later, Perrico was charged with three counts of furnishing alcohol to an underage person, in violation of R.C. 4301.69(A), for providing T.B., C.P., and B.R. with alcohol. He was also charged with sexual imposition, in violation of R.C. 2907.06(A)(1), for his alleged offensive sexual contact with C.P. At first, Perrico pleaded not guilty to all four charges. Yet, following pretrial discussions between counsel, the trial-court judge, and the victims, Perrico ultimately pleaded guilty to two counts of furnishing alcohol to a minor[1] and one count of misdemeanor assault, in violation of R.C. 2903.13. But the alleged factual basis for this latter offense remained the same as the bare-bones allegations that were the basis for the original offense of sexual imposition. The criminal complaint charging Perrico was not amended to supply additional facts to support the new assault offense. Nor did the state (or Perrico) offer any evidence

---

1. The charge of furnishing alcohol to T.B. was dismissed because, at the time of the events in question, Perrico could legally provide T.B. with alcohol as her stepfather.

at Perrico's plea hearing to explain how Perrico's alleged touching of C.P. met the requirements of assault rather than those of sexual imposition.

{¶ 41} I have no concerns about Perrico entering into a plea agreement resolving his convictions for furnishing alcohol to an underage person. Perrico admitted during his disciplinary-hearing testimony that he had provided T.B., C.P., and B.R. with alcohol. Rather, my concerns lie with his guilty plea to misdemeanor assault for his alleged conduct toward C.P.

{¶ 42} Let's be clear about what happened here. C.P. accused Perrico—a man nearly 30 years older than her and the stepfather of her friend—of groping her breasts, vagina, thighs, and arms while she was intoxicated. And for those alleged acts, Perrico was charged with sexual imposition, which prohibits an offender's sexual contact with another person when "[t]he offender knows that the sexual contact is offensive to the other person * * * or is reckless in that regard." R.C. 2907.06(A)(1). By contrast, misdemeanor assault criminalizes an offender's knowingly causing physical harm or recklessly causing serious physical harm to another person. R.C. 2903.13(A) and (B). These are wholly different offenses. Sexual imposition focuses on the sexual element and offensive nature of the contact. Assault carries no such requirements—rather, it focuses on the causing of physical harm. These are not differences in degree but in kind. The statutes criminalize *different offenses* rather than distinguishing between the *severity* of a prohibited action.

{¶ 43} Despite these differences, Perrico was allowed to plead guilty to misdemeanor assault for his alleged groping, even though the facts in the criminal complaint made *no allegations* that he physically *harmed* C.P. Nor were the original facts amended or new facts presented during the plea hearing to include this new element. Instead, for reasons that we are not privy to, because there is no record explaining or justifying the change, the state and the trial court in Perrico's

criminal case allowed him to plead guilty to a crime for which he was not charged and that was not supported by the charging documents.

{¶ 44} This is not simply an instance in which Perrico was allowed to plead to a lesser offense to that of sexual imposition. For starters, misdemeanor assault is a higher-degree offense than sexual imposition; the former is classified as a first-degree misdemeanor, while the latter is a third-degree misdemeanor. *Compare* R.C. 2903.13(C)(1) *with* R.C. 2907.06(C). But even if assault were a lower-level offense, it still wouldn't be a lesser-included offense of sexual imposition. A lesser-included offense is not simply a crime of lesser degree than the charged offense. It must also be *impossible* to commit the greater offense without *also* committing the lesser offense. *State v. Wilkins*, 64 Ohio St.2d 382, 384, 415 N.E.2d 303 (1980). And at least one element of the greater offense must not be necessary to prove the lesser offense. *Id.* Even assuming that assault was a crime of lesser degree than sexual imposition, the elements of the two crimes are so disparate that they are wholly separate offenses. An offender could engage in sexual contact he or she knows to be offensive without knowingly or recklessly causing physical harm or serious physical harm to the victim.

{¶ 45} My concern with what happened in Perrico's criminal case does not stem from assault somehow being an inferior crime than sexual imposition. Assault is no such thing. Instead, my concern arises from the fact that Perrico could plead guilty to a crime that was not rooted in the conduct he was accused of. What is more, all this occurred without any explanation for the change or modifications to the facts on which Perrico had been haled into court. And it is the lack of any factual grounds for the crime of misdemeanor assault, of which Perrico was convicted, that gives me the most pause.

{¶ 46} Even superficially, it is easy to see why Perrico took the plea deal. Beyond simply resolving his criminal case, Perrico's guilty plea carried two collateral benefits. First, in pleading to assault rather than sexual imposition,

Perrico avoided Ohio's sex-offender registration laws. *See generally* R.C. 2950.01(A)(1) and (E)(1)(a), 2950.03(A), and 2950.04 (defining the offenses subject to the sex-offender registry and setting out the framework that requires those convicted of a sexually oriented offense to register with state authorities for a period of time following their conviction). Second, while a conviction for sexual imposition cannot be sealed, Perrico's conviction for misdemeanor assault was eligible for sealing and expungement one year after the resolution of his case. *Compare* R.C. 2953.32(A)(1)(c) (excluding sexually oriented offenses that require postconviction registration under R.C. Chapter 2950 from the sealing-and-expungement scheme) *with* R.C. 2953.32(B)(1)(a)(ii) (making multiple misdemeanors eligible for sealing or expungement one year after an offender's final discharge). But the lack of a factual record surrounding Perrico's plea gives him a third perk—the chance to craft the narrative of his criminal conduct to suit his own ends.

{¶ 47} The record here is replete with examples of Perrico changing the motivations and facts behind his guilty plea to best suit his purposes. Let's start with his motivations for pleading. When first replying to disciplinary counsel about the grievance initiating this action, Perrico explained that he pleaded guilty to the assault charge because he "did not want to take any risk of being convicted of the [s]exual [i]mposition charge and labeled as a sex offender." Then, while testifying during his disciplinary hearing, Perrico gave two new reasons motivating his plea. Perrico told the disciplinary-board panel that he pleaded to the assault charge intending to have his convictions sealed promptly, something that wouldn't be possible if he pleaded guilty to or was convicted of sexual imposition. But he went further during other points in his testimony, saying that his plea was to protect his son from "this nonsense," by which he meant C.P.'s allegations.

{¶ 48} A similar evolution exists with the criminal conduct Perrico claimed was the source of his guilty plea to assault. During a deposition taken by

disciplinary counsel, Perrico asserted that he had pleaded guilty to "an unwanted touch, apparently." But he also categorically asserted that because no criminal complaint accused him of assault, there were no facts for him to plead to. Perrico raised similar arguments while testifying at his disciplinary hearing, insisting that he had not pleaded guilty to the facts in the criminal complaint, which accused him of having offensive sexual contact with C.P. He also claimed that the assault he was guilty of was the physical harm he caused by giving alcohol to C.P., which caused her to become sick, and it was that assault he had in mind when he pleaded guilty.

{¶ 49} All the assertions Perrico made throughout the disciplinary process about the motivations for and content of his guilty plea to assault might be true. Just as easily, they might be false. But we cannot know—nor could the board have known—because the criminal record available to us is simply silent on these issues. All we know is that Perrico was charged with sexual imposition arising out of C.P.'s allegations and that Perrico pleaded to misdemeanor assault as part of a plea agreement. In short, Perrico pleaded guilty to a crime that appears to have no factual basis whatsoever in the criminal record because the result was of greater benefit to him. The rest is lost to the black box of plea negotiations and agreements, into which one set of law and facts go and out of which a result emerges, seemingly without factual support or explanation.

{¶ 50} Perrico's conviction provides nothing other than his brute admission to criminal conduct, and so it does not provide a yardstick by which the board or this court can assess his misconduct. Instead, we are subject to the narrative Perrico creates to suit the situation as he sees fit. Or at least that would be the case had T.B., B.R., and C.P. not testified at the disciplinary hearing about Perrico's actions. And because they did testify, the board received the full picture of Perrico's misconduct and was able to recommend a sanction consistent with our precedent.

{¶ 51} But what about those situations in which the victims are unable or unwilling to testify at the attorney's disciplinary hearing?  One of the functions of the criminal process is to arrive at the truth of the accusations and then, as necessary, mete out punishment.  Both the public and entities like the board and our court rely on the integrity of the conclusions and outcomes reached by the criminal process.  If the criminal process shirks its fact-finding role, then the ability of the public and those entities to rely on the outcomes from that process is undercut.

{¶ 52} The board can rely only on the facts presented to it and then seek to apply this court's precedent in determining whether misconduct has occurred and what sanctions are appropriate.  But if, as here, one of the fact-finders on which the board should reasonably be able to rely doesn't do its job, thereby leaving the recitation and interpretation of the facts up to the attorney who is accused of misconduct stemming from criminal behavior, then the board's job is made that much harder.  Indeed, the board's authority is undermined, because it is being asked to determine the nature and veracity of criminal convictions while also trying to fulfill its role of assessing and sanctioning attorney misconduct.

{¶ 53} All this leads me to repeat the call I recently made in *Disciplinary Counsel v. Goodman,* ___ Ohio St.3d ___, 2024-Ohio-852, __ N.E.3d__, ¶ 41 (Donnelly, J., concurring), for this court to reconsider adopting a rule requiring guilty pleas to "have a factual basis in the conduct defendants actually committed." Until this court revisits that proposed rule, we will be forced to tolerate factually baseless pleas, even though, as demonstrated by this case and *Goodman*, those pleas undermine public confidence in the criminal-justice system and impede collateral proceedings—such as the attorney-disciplinary process—that must rely on them.

———————————

**KENNEDY, C.J., concurring in part and dissenting in part.**

{¶ 54} Respondent, Daniel Edward Perrico, betrayed the trust of three young women who looked up to him as a father figure, one of whom was his 15-

year-old stepdaughter, T.B. Perrico not only furnished alcohol to these underage women, but he also inappropriately touched one of the women on her vagina, thighs, breasts, and arms while she was intoxicated. Based on this misconduct, I would suspend Perrico for two years with no stay. So, while I concur with the majority's determination that Perrico violated the Rules of Professional Conduct, I dissent from its decision to impose a partially stayed two-year suspension.

{¶ 55} The majority and concurring opinions set forth the facts of this case in appropriate detail, but I must set the scene to emphasize the egregious nature of Perrico's planned and predatory conduct. About a week before the events in question, Perrico set up a time with C.P., T.B.'s 18-year-old friend from high school, to show C.P. how to make a truffle macaroni and cheese recipe. When C.P. arrived at Perrico's home on the scheduled date, Perrico made C.P. some mixed alcoholic drinks and proceeded to teach her how to make truffle macaroni and cheese. C.P. testified that in doing so, Perrico taught her "like how a boyfriend would teach his girlfriend how to * * * cook if she was inadequate in cooking." While they were in the kitchen, Perrico gently caressed her, touching her arms in the process. C.P. testified that Perrico also touched the small of her back and that these "soft touches" made her "uncomfortable."

{¶ 56} Unfortunately, Perrico's "caressing" C.P. in the kitchen is the least concerning conduct that he exhibited that night. Eventually, T.B. came home, and later that evening, B.R., another friend of T.B. and C.P., came over too. B.R. was also 18. Throughout the night, Perrico furnished alcoholic mixed drinks and shots to all three young women. The drinking eventually escalated to the point that C.P. and B.R. became sick from consuming so much alcohol. At that time, C.P. went to the basement bathroom and began vomiting. She testified that Perrico followed her down to the bathroom, sat on the floor near her, pulled her on to his lap, and began touching her vagina, thighs, breasts, and arms over her clothing. C.P. testified that as Perrico was touching her, his penis was erect and that he said, "All the dirty

things I could do to you right now." When T.B. went down to the basement to check on C.P., the bathroom door had been shut with C.P. and Perrico inside. T.B. returned to the basement to check on C.P. on several occasions, and each time T.B. found that the door had been closed, despite the fact that she left the door open every time she looked in on C.P. T.B. testified that when Perrico attempted to help her lift C.P. from the bathroom floor to move her to a couch, she saw Perrico place his hands on C.P.'s breasts. These actions, according to the Board of Professional Conduct and a majority of this court, are worthy of only a one-year actual suspension with a second year stayed.

{¶ 57} Aside from the board's and the majority's missteps in assessing the gravity of Perrico's conduct with C.P. and the other young women, they also fail to fully consider Perrico's testimony and behavior during his disciplinary hearing. His testimony and behavior cut directly through one of the mitigating factors found by the board and adopted by the majority, namely, that Perrico exhibited a cooperative attitude during the disciplinary proceedings, *see* Gov.Bar R. V(13)(C)(4). In adopting that mitigating factor, the majority points to Perrico's willingness to be deposed in Columbus and to allow the use of his sealed convictions, but in doing so, the majority ignores the lie-filled testimony and evasive behavior that Perrico engaged in during his disciplinary hearing in an effort to avoid responsibility for his actions. This is exemplified by the fact that Perrico (1) admitted to supplying drinks to the young women but also tried to pass the blame off to them by suggesting that they were experienced drinkers, (2) tried to downplay his comment to C.P. about "all the things [he] could do to [her]," even though that statement was clearly sexually charged, (3) claimed that he did not touch C.P. in a sexual manner despite having failed to deny those allegations during an earlier recorded phone call with C.P., and (4) changed his explanation during the disciplinary hearing about why he pled guilty to assault in comparison to the reasons he gave in his earlier

response to disciplinary counsel's letter of inquiry. Contrary to the majority's belief, Perrico was far from cooperative.

**{¶ 58}** I further emphasize and agree with the board's finding that Perrico touched C.P. in a sexual manner and that Perrico's conduct constituted sexual imposition, even though he was not convicted of that offense. But I would go a step further and find that Perrico's conduct constituted gross sexual imposition. Although Perrico pled guilty to an amended charge of misdemeanor assault, we have recently acknowledged that "in disciplining an attorney for misconduct that also constitutes a criminal offense, we are not limited to considering the charges brought for a particular crime; rather, we must also examine the conduct underlying the offense." *Disciplinary Counsel v. Goodman*, __ Ohio St.3d __, 2024-Ohio-852, __ N.E.3d __, ¶ 24; *see also Disciplinary Counsel v. Romer*, 172 Ohio St.3d 680, 2023-Ohio-3099, 226 N.E.3d 959, ¶ 20.

**{¶ 59}** R.C. 2907.05 establishes the crime of gross sexual imposition, and R.C. 2907.05(A)(5) provides that "[n]o person shall have sexual contact with another * * * when * * * [t]he ability of the other person to resist or consent * * * is substantially impaired because of a mental or physical condition * * *, and the offender knows or has reasonable cause to believe that the ability to resist or consent of the other person * * * is substantially impaired because of a mental or physical condition." Such conduct constitutes a fourth-degree felony. R.C. 2907.05(C)(1).

**{¶ 60}** The record before us establishes by clear and convincing evidence that Perrico's conduct constituted gross sexual imposition. *See* Gov.Bar R. V(12)(I) (requiring professional misconduct of attorneys to be proved by clear and convincing evidence); *see also Disciplinary Counsel v. Cox*, 168 Ohio St.3d 78, 2022-Ohio-784, 195 N.E.3d 1018, ¶ 17. "Unless the record weighs heavily against a hearing panel's findings, we defer to the panel's credibility determinations, inasmuch as the panel members saw and heard the witnesses firsthand." *Cuyahoga*

*Cty. Bar Assn. v. Wise*, 108 Ohio St.3d 164, 2006-Ohio-550, 842 N.E.2d 35, ¶ 24. Here, the board determined that the young women's testimony was more credible than Perrico's testimony. And C.P.'s testimony establishes that Perrico touched her vagina, thighs, breasts, and arms. But that is not all.

**{¶ 61}** The record also shows that C.P.'s intoxication was a mental or physical condition that substantially impaired her ability to resist or consent to Perrico's sexual contact and that Perrico knew that C.P. was intoxicated when he touched her. In analyzing a statute with similar language, R.C. 2907.02(A)(1)(c), courts across Ohio have found that voluntary intoxication constitutes a "mental or physical condition" that can cause a person to be "substantially impaired." *See, e.g.*, *State v. Foster*, 2020-Ohio-1379, 153 N.E.3d 728, ¶ 42 (8th Dist.); *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, ¶ 21 (2d Dist.); *State v. Harmath*, 3d Dist. Seneca No. 13-06-20, 2007-Ohio-2993, ¶ 14-15; *State v. Martin*, 12th Dist. Brown No. CA99-09-026, 2000 WL 1145465, *5 (Aug. 14, 2000). On the night at issue here, C.P. consumed alcohol to the point that she got sick. *See Foster* at ¶ 48 (explaining that vomiting can be evidence that alerts an offender as to whether a victim was substantially impaired). And all evening, Perrico had been in her presence and even provided alcoholic drinks to her. Therefore, because C.P. was substantially intoxicated and because Perrico knew C.P. was intoxicated at the time he made sexual contact with her, there is clear and convincing evidence that Perrico committed gross sexual imposition, an "illegal act that reflects adversely on [his] honesty or trustworthiness," Prof.Cond.R. 8.4(b), and "conduct that adversely reflects on [his] fitness to practice law," Prof.Cond.R. 8.4(h). *See Disciplinary Counsel v. Carter*, __ Ohio St.3d __, 2023-Ohio-3992, __ N.E.3d __, ¶ 22 (explaining that whether or not someone was charged with a crime has "no bearing" on this court's determination whether professional misconduct has been proven by clear and convincing evidence); *Goodman*, __ Ohio St.3d __, 2024-Ohio-852, __ N.E.3d __, at ¶ 24. Perrico's noncredible testimony, as explained

above, is filled with inconsistencies, contradictions, lies, and evasion, and it holds no weight here.

{¶ 62} The majority correctly states that the purpose of attorney discipline " 'is not to punish the offender, but to protect the public.' " Majority opinion, ¶ 28, quoting *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 53. But it overlooks the fact that one way this court can protect the public is "by demonstrating to the bar and the public that this type of conduct will not be tolerated," *Disciplinary Counsel v. Schuman*, 152 Ohio St.3d 47, 2017-Ohio-8800, 92 N.E.3d 850, ¶ 17. A two-year suspension with no stay would make such a statement.

{¶ 63} For these reasons, I dissent from the majority's sanction of a partially stayed suspension and would impose a two-year suspension with no stay.

_____

Joseph M. Caligiuri, Disciplinary Counsel, and Karen H. Osmond and Audrey E. Varwig, Assistant Disciplinary Counsel, for relator.

Plakas Mannos and Peter T. Cahoon, for respondent.

_____